```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| DAVID RYAN, et al., | : |
|         Plaintiffs, | :   Civil Action No. <br> :   06-5866-NLH-AMD |
|         v. | : <br> :   **OPINION** |
| T.L. SMITH, et al., | : |
|         Defendants. | : |

**APPEARANCES**:

Randy P. Catalano, Esquire
216 Haddon Avenue, Suite 100
Westmont, NJ 08108

    *Attorney for Plaintiffs*

Stephen D. Menard, Esquire
BURNS, WHITE & HICKTON, LLC
503 Carnegie Center, Suite 103
Princeton, NJ 08540

    *Attorneys for Defendants McNeilus Truck & Manufacturing,*
    *Inc. and Oshkosh Truck Corporation*

Alexander J. Anglim, Esquire
David Jay, Esquire
GREENBERG TAURIG, LLP
200 Park Avenue
P.O. Box 677
Florham Park, NJ 07932

    *Attorneys for Defendants Trinity Industries, Inc., Transit*
    *Mix Concrete & Materials Company, and TEMCO*

**HILLMAN, District Judge**

**I.   INTRODUCTION**

    This matter comes before the Court on the Motion for Summary

Judgment filed by Defendants McNeilus Truck & Manufacturing, Inc.

and Oshkosh Truck Corporation (hereinafter collectively referred to as "McNeilus Defendants"), the Motion for Summary Judgment filed by Defendants Trinity Industries, Inc., Transit Mix Concrete & Materials Company, and TEMCO (hereinafter collectively referred to as "Trinity Defendants"), and the Cross-Motion for Summary Judgment filed by Plaintiffs David Ryan and Anna Mae Ryan. For the reasons set forth below, the motions of both McNeilus Defendants and Trinity Defendants will be granted, while Plaintiffs' cross-motion will be denied.

**II.   BACKGROUND**

Plaintiff David Ryan alleges that on December 2, 2003, while working as a cement truck driver, he fell when the "pull down" ladder attached to the rear of his "Rex 770" model cement mixer broke free from the vehicle while he was standing on it. As a result of the fall, Plaintiff David Ryan alleges that he suffered, *inter alia*, serious bodily injuries. Plaintiff Anna Mae Ryan, David Ryan's wife, alleges that she suffered a loss of consortium as a result of his injuries from the fall.

The Rex 770 model cement mixer at issue was manufactured by Rexworks, Inc. (hereinafter, "Rexworks") in 1988. On March 8, 2000, Rexworks entered into a purchase and sale agreement with TEMCO, whereby it sold that company certain assets. Pursuant to the agreement, TEMCO received the right to use the Rex and Rexworks names, as well as its cement mixer designs, customer

lists, and certain raw materials (hereinafter, "the Assets"). Rexworks kept its factory and was required to change its name.

The agreement between Rexworks and TEMCO expressly provided that TEMCO was not "assuming any liabilities [of Rexworks], whether known or unknown," except as specifically provided by the agreement. The agreement also included an indemnity clause benefitting TEMCO, although product liability claims were not included in the clause. Further, the agreement provided that TEMCO would not obtain the Assets until after Rexworks completed the backlog of orders it had at the time of the closing on the agreement. TEMCO ultimately took possession of the Assets in June 2000.

Following TEMCO's acquisition of the Assets from Rexworks, Mark Stiles, an executive at Trinity Industries, Inc. (hereinafter, "Trinity"), TEMCO's parent company, issued a press release stating, in relevant part, that "these purchases significantly expand on our product offerings." The press release also provided that "Rexworks good reputation and relationship with its customer network will enhance our sales efforts." In a separate press release, Stiles said that "[i]n addition to expanding our existing product lines in the area, Rexworks provides access to an established distribution channel."

TEMCO manufactured its own line of cement mixers prior to the purchase of the Rexworks's assets, and continued to do so

3

following the purchase. After the purchase, TEMCO never manufactured concrete mixers using the Rex or Rexworks trademarks. Nor did TEMCO ever pursue any Rexworks customers directly. Although Rexworks had the right to act as a distributor for TEMCO under the agreement, neither TEMCO nor Rexworks ever sold any cement mixers under the distribution agreement. With respect to the raw material it acquired, TEMCO scrapped some of it, used some of it to build products for sale, and stored the balance.

TEMCO asserts that its primary objective in purchasing the Assets from Rexworks was to acquire the ability to manufacture the Rexworks transmission, or "gearbox." TEMCO intended to incorporate this transmission, which had a reputation for quality, into its own cement mixer lines. Following the transaction, TEMCO began to produce Rex transmissions using the design documents it acquired from Rexworks. TEMCO also advertised that it was able to furnish the Rex transmission in its TEMCO mixers.

TEMCO shut down its cement mixer business only a few months after purchasing the Assets from Rexworks. It stopped pursuing new cement mixer orders in February, 2001. On March 6, 2001, TEMCO sold all of the assets of its cement mixer business, including those acquired from Rexworks, to Oshkosh Truck Corporation (hereinafter, "Oshkosh"). The asset purchase

agreement between Oshkosk and TEMCO expressly excluded any liabilities or obligations of TEMCO.  Oshkosh asserts that its primary motivation for the purchase was to obtain more work selling parts for concrete trucks.  Additionally, the purchase would eliminate TEMCO as a competitor of Oshkosk.

Oshkosh never made any use of the Rex or Rexworks trademarks, and let the trademarks lapse.  Both Oshkosh and McNeilus Truck & Manufacturing (hereinafter, "McNeilus"), a wholly owned subsidiary of Oshkosh, manufactured their own cement mixers prior to the purchase, and continued to do so afterwards.  Neither Oshkosh, nor McNeilus took over Rexworks's operations, and by the date of the purchase, the Rex product line was no longer being manufactured by anyone.  All Rexworks parts and equipment included as part of the purchase from TEMCO were either sold or scrapped.

On November 18, 2005, Plaintiffs filed suit in the Superior Court of New Jersey - Law Division, Burlington County against Trinity Defendants.  The Complaint was subsequently amended on two separate occasions to include additional claims and name McNeilus Defendants.  The action was removed to this Court on December 7, 2006.  After obtaining leave of Court, Plaintiffs filed a Third Amended Complaint on March 31, 2008 naming Rexworks

5

as a defendant.[1]

In response to a motion to dismiss from the Trinity Defendants, Plaintiffs moved for summary judgment against Defendants on the issue of successor liability on June 2, 2008. Thereafter, on August 26, 2008, the Court held that "because discovery has not taken place, [P]laintiffs have not provided any evidence that [D]efendants have continued to 'manufacture essentially the same line of products as its predecessor,' and have benefitted 'from trading its product line on the name of its predecessor.'" Ryan v. T.L. Smith, No. 06-cv-5866-NLH-AMD, slip op. at 19 (D.N.J. Aug. 26, 2008). The Court provided that Plaintiffs could renew their motion at a later date "if they obtain facts to support their 'product line' theory of liability." Id. at 19-20.

Both the McNeilus and Trinity Defendants have now moved for summary judgment. In response, Plaintiffs have cross-moved for summary judgment.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and

---

[1] Although Rexworks has been named as a defendant, Plaintiffs have failed to effectuate proper service upon it as required by Fed. R. Civ. P. 4(m). Accordingly, Plaintiffs' claims against Rexworks are dismissed.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify

7

specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Analysis**

Plaintiffs seek to hold McNeilus and Trinity Defendants liable for the allegedly defective ladder on the Rex 770 at issue as successors to the interests of Rexworks, which Plaintiffs assert is no longer a viable entity.[2]  McNeilus and Trinity Defendants argue that they cannot be liable as successors to Rexworks, because they did not continue its production of the Rex 770 model cement mixer on which Plaintiff David Ryan was injured.

The Supreme Court of New Jersey has held that

> where one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and *undertakes essentially the same manufacturing operation* as the selling corporation, the purchasing corporation is strictly liable for injuries caused by *defects in units of the same product line*, even if previously manufactured and distributed by the selling corporation or its predecessor.

---

[2] Defendants argue that Plaintiffs have failed to provide any evidence that their remedy against Rexworks has been destroyed. "[T]he destruction of the injured party's remedy is a *necessary* but not *sufficient* basis on which to place liability on the successor." Leo v. Kerr-McGree Chemical Corp., 37 F.3d 96, 99 (3d Cir. 1994) (emphasis in original). The Court has decided these motions on alternative grounds, and so, makes no findings with respect to this issue.

<u>Ramirez v. Amsted Industries, Inc.</u>, 431 A.2d 811, 825 (N.J. 1981) (emphasis added).  In reaching this holding, the Supreme Court of New Jersey noted that

> [t]he social policies underlying strict product liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers.

<u>Id.</u>  An intermediate successor may also be held liable under a product-line theory where it acquired all the manufacturing assets of the original manufacturer only to then sell those assets to a subsequent successor and discontinue the product line at issue.  <u>See</u> <u>Nieves v. Bruno Sherman Corp.</u>, 431 A.2d 826, 828 (N.J. 1981).

In order to be "manufactur[ing] essentially the same line of products," as required by <u>Ramirez</u>, it is not enough to simply produce the same general type of product as the predecessor.[3]

---

[3] Plaintiff cites to dicta in <u>Falor v. G&S Billboard</u>, No. 04-cv-2373(HAA), 2008 WL 539225, at *8 (D.N.J. Feb. 27, 2008) (unpublished) for the proposition that simply being in the same line of work as the seller after the acquisition is sufficient to be manufacturing "essentially the same line of products" as required by <u>Ramirez</u>.  However, that proposition stands in contradiction to the clear holding set out in <u>Potwora</u>, which the New Jersey Supreme Court declined to upset by denying certification.  In light of the clear holdings of New Jersey courts on this issue, the Court decline to follow the dicta expressed in <u>Falor</u>.

See Potwora ex rel. Gray v. Grip, 725 A.2d 697, 706 (N.J. Super. App. Div. 1999) (finding that the plaintiff failed to carry his burden where "[t]he proofs merely demonstrate that Vector Sports continued manufacturing many of the same helmets as Land Tool but there is no meaningful evidence that it continued the RG-4 line"), cert. denied, 735 A.2d 575 (N.J. 1999); Jenkins v. Anderson Machine Sales, No. A-3707-00T5, 2002 WL 31398172, at *6 (N.J. Super. App. Div. Aug. 1, 2002) (unpublished) (finding that plaintiff failed to carry her burden where she only offered testimony as to the "general similarity of product," and "not to the specifics of the product line per se").  For example, as the New Jersey Appellate Division held in Potwora, simply manufacturing helmets is not enough to bring the successor of a helmet company within the holding of Ramirez.  See Potwora, 725 A.2d at 707.  There must be evidence that the successor continued to manufacture a particular line of helmets.  See id.

   That is not to say that the products need to be identical. See id. at 706 ("While the successor must undertake essentially the same manufacturing operation, the operation need not be identical.").  Updating a product line with technological advances will not change the fact that it is a continuation of a particular product line.  See Bussell v. DeWalt Prod. Corp., 614 A.2d 622, 631-32 (N.J. Super. App. Div. 1992) (holding successor liable even though it had updated the product line with

10

technological advances, so it was not the exact product manufactured by the predecessor), cert. denied, 627 A.2d 1137 (N.J. 1993). A plaintiff bears the burden of establishing that a party is a successor within the meaning of Ramirez. See Potwora, 725 A.2d at 707.

In this case, it undisputed that TEMCO did not continue to produce the Rex 770 model cement mixer, or manufacture any other cement mixer using the Rex or Rexworks trademarks. Accordingly, TEMCO did not continue to manufacture "essentially the same line of products" as required by Ramirez. That TEMCO manufactured cement mixers in general, both before and after its acquisition of the Assets from Rexworks, does nothing to alter this fact.

Plaintiff argues that TEMCO "incorporated and assimilated" equipment and raw materials acquired from Rexworks into its line of TEMCO cement mixers. Indeed, it is undisputed that TEMCO began to produce Rex transmissions using the design documents it acquired from Rexworks, and advertised that it was able to furnish the Rex transmission in its TEMCO mixers. However, that is insufficient to establish successor liability. It was not the transmission that caused Plaintiff David Ryan's injuries. Rather, he was injured by an allegedly defective pull down ladder on a Rex 770 cement mixer, and there is no evidence whatsoever that TEMCO continued the production of either the Rex 770 or the Rexworks pull down ladders.

Further, Plaintiffs have failed to present any evidence that Oshkosh continued production of the Rex 770 model cement mixer, or any other cement mixer using the Rex or Rexworks trademarks. Indeed, Plaintiffs have not disputed that Oshkosh let the trademarks lapse without having made use of them, and never manufactured any Rexworks's product line.  Accordingly, Oshkosh likewise did not continue to manufacture "essentially the same line of products" as required by Ramirez.

Plaintiffs argument for successor liability is premised in large part on a mistaken interpretation of the law.  In support of their arguments, Plaintiffs cite to Pacius v. Thermtroll Corp., for the proposition that "[i]t is the acquisition of the assets which is determinative of liability[,] not the fact that the product line is continued by the successor."  611 A.2d 153, 157 (N.J. Super. Law Div. 1992).  However, this is not an accurate statement of the law in New Jersey.  See Lefever v. K.P. Hovnanian Enterprises, Inc., 734 A.2d 290, 301 n.4 (N.J. 1999) (noting that "it is wrong to impose successor liability on an asset purchaser that discontinues the product line," and disapproving of Pacius); Saez v. S&S Corrugated Paper Machinery Co., Inc., 695 A.2d 740, 745-47 (N.J. Super. App. Div. 1997) (finding that Pacius's holding "is not an expression of the New Jersey Supreme Court," and questioning whether the New Jersey Supreme Court would ever "adopt as blatant a 'deep pocket' theory

12

or recovery" as set out in Pacius, while reaffirming that for successor liability "there must be a continued manufacture of the product line wherein the purchaser utilizes the predecessor's name and good will").

Plaintiffs also place significant reliance on fairness and policy considerations.  In Ramirez, the New Jersey Supreme Court set out certain policy considerations that justified the imposition of potential liability on successors that "acquire[] the assets and continue[] the manufacturing operation of the predecessor."  431 A.2d at 820.  Those considerations were:

> (1) [t]he virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading role, and (3) the fairness of requiring the successor to assume the responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

Id.  Plaintiffs seek to impose liability on Defendants in the name of fairness simply because their remedy has allegedly been destroyed, Defendants can allegedly spread the costs to consumers, and Defendants allegedly enjoyed the good will of Rexworks.  However, these policy considerations are simply that: considerations that led the New Jersey Supreme Court to create the product line test for successor liability, which is set forth and applied above.  They are not the test for successor liability

13

itself.  Indeed, "[i]t is important to remember that the product-line exception is precisely that: an *exception* to the *rule* that a successor corporation is not liable for the acts of the predecessor corporation."  Falor, 2008 WL 539225, at *8.

Finally, Plaintiffs suggest that Defendants should be liable because they enjoyed the goodwill established by Rexworks.  In support of this argument, Plaintiffs point to a number of newspaper articles and press releases in which officials from Trinity expound on the value of the Rexowrks name.  While there is evidence to suggest that TEMCO enjoyed some level of goodwill generated by Rexworks, such goodwill in and of itself is insufficient to create liability.  In order to create liability, any exploitation of a predecessor's goodwill, business reputation, and established customers must "be a consequence of the continued manufacture of the predecessor's product."  Saez, 695 A.2d at 747.

Thus, Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact as to whether either Trinity or McNeilus Defendants continued to manufacture essentially the same line of products as Rexworks.[4]  Successor

---

[4] The only evidence proffered - the two TEMCO press releases - is insufficient to establish a material issue of fact.  The releases, which can be fairly characterized as the typical business puffing attendant to an acquisition, do not undermine or otherwise call into question the otherwise uncontested fact that neither Trinity or McNeilus continued to make, market, and sell the Rexworks ladders and mixers.

14

liability is therefore unavailable against them and summary judgment must be entered against Plaintiffs.

**V.   CONCLUSION**

For the foregoing reasons, the motions of both McNeilus Defendants and Trinity Defendants are granted, while Plaintiffs' cross-motion is denied.  An Order consistent with this Opinion will be entered.


Dated:  March 4, 2010          s/ Noel L. Hillman
                               HON. NOEL L. HILLMAN, U.S.D.J.


At Camden, New Jersey

15